IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MAGALY HERNANDEZ,          )
                                      )
            Plaintiff,        )
                                      )
      v.                    )     Civil Action No. 1:16cv0502 (AJT/MSN)
                                      )
FAIRFAX COUNTY,            )
                                      )
            Defendant.     )
_____)

## MEMORANDUM OPINION

This employment discrimination case is before the Court on Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 [Doc. No. 32] (the "Motion").  In her three count Amended Complaint [Doc. No. 8] ("AC"), Plaintiff Magaly Hernandez ("Hernandez") alleges that her employer, Fairfax County (the "County"), engaged in sexual harassment and retaliation when she complained of that harassment, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–e-17 (1964).  The Court held a hearing on Defendant's Motion on December 9, 2016, following which it took the matter under advisement.[1]  For the reasons stated below, the Motion is GRANTED, and this action will be DISMISSED.

## I.   BACKGROUND

Unless otherwise indicated, the following facts are either undisputed or, where disputed, stated in the light most favorable to the Plaintiff.

---

[1] Following the hearing and without leave of the Court, Plaintiff filed an additional affidavit that purported to answer certain questions which the Court had asked of Plaintiff's counsel during the hearing.  [*See* Doc. No. 58.]  Defendant then filed a motion to strike the supplemental filing.  [Doc. No. 59.]  Plaintiff has not opposed that motion. The Court has granted Defendants' motion to strike Plaintiff's supplemental affidavit.  Nevertheless, nothing in Plaintiff's affidavit would materially affect either the Court's analysis or its ruling on the Motion.

1.      Hernandez has been employed as a firefighter with the Fairfax County Fire and Rescue Department (the "FRD") since December 11, 2006.  Defendant's Memorandum in Support of its Motion for Summary Judgment [Doc. No. 33] ("Def.'s Mem. Supp.") ¶ 1.  On October 1, 2013, Hernandez voluntarily transferred to the C-Shift at Fire Station 42 ("FS 42-C-shift"), at which Jon Bruley ("Bruley") was the Station Captain at that time.  *Id.* ¶ 2.  FS 42-C is within FRD's second battalion and, at all relevant times, Cheri Zosh ("Zosh") was the Battalion Chief for C-shift of the second battalion.

2.      Hernandez first felt harassed in October 2013, within hours of her first working together with Bruley, when Bruley blocked her path in the hallway.  Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment [Doc. No. 53] ("Pl.'s Mem. Opp'n") 3; *id.*, Ex. 1 ("Hernandez Declaration" or "Hernandez Decl.") ¶1.

3.      In November or December 2013, Bruley walked up behind Hernandez and placed his chin on her shoulder while she was engaged in a conversation with colleagues.  Def.'s Mem. Supp. ¶ 3.  Hernandez said, "Captain, I don't like people that close to me.  It makes me feel uncomfortable.  I don't like it."  *Id.*  Bruley acted like he was leaving but then propped his hand up against the door of the room and positioned his body "right up against" Hernandez. Hernandez ducked under his arm and stepped out of the room.  *Id.*

4.      In early 2014, Bruley asked Hernandez for a hug, and when she did not comply, Bruley placed his arm on her.[2]  Pl.'s Mem. Opp'n 3.  Around that same time, in early 2014, Bruley placed his chin on Hernandez's shoulder again, this time in the kitchen of the fire station.  Def.'s Mem. Supp. ¶ 4.  Hernandez again told Bruley she didn't like it when people get that close to her and walked out of the room.  *Id.*

---

[2] Defendant claims this incident, as well as the October, 2013 incident, never happened and that Hernandez' reference to these incidents contradicts her deposition testimony.  *See* Defendant's Memorandum in Reply [Doc. No. 55] ("Def.'s Reply") 3 n.2.

5.      On three separate occasions prior to April 2014, Bruley invited the entire FS 42-C-shift over to his house for a pool party. *Id.* ¶ 9.  On one of those occasions, Hernandez indicated an interest in coming but said she would just watch because she does not wear bathing suits and does not enjoy swimming.  On two of those occasions, Bruley responded that he wanted to see her in a bathing suit.  Pl.'s Mem. Opp'n 4.  He repeated his desire to see her in a bathing suit, even after she said his remarks made her feel uncomfortable.  *Id.*

6.      On a separate occasion prior to April 2014, a number of firefighters were discussing emergency scenarios in the kitchen of the fire station.  Bruley told Hernandez that if they had to respond to a fire, the two of them would have to work together as a team.  Hernandez said she was fine with that arrangement.  Bruley responded, "But you are not going to be able to handle that big hose now, are you?"[3]  *Id.*  Hernandez interpreted Bruley's comment to have a sexual innuendo and told Bruley that the remark was inappropriate, but Bruley did not apologize.  *Id.*

7.      On April 29, 2014, an incident occurred between Bruley and Hernandez while she was standing over a colleague at a computer viewing vacation photos with her colleagues.  Def.'s Mem. Supp. ¶ 5.  Hernadez recalls that while looking at the pictures, she felt a "nudge on [her] heel.  [She] turned around to find Capt. Bruley had again snuck up behind [her].  [She] asked him to back up and told him again that [she doesn't] like [her] personal space invaded like that."  Hernandez Decl. ¶ 8.  Hernandez also recalls that during that incident, Bruley put his chin on her shoulder, and Hernandez said "what the hell," and walked away.  Pl.'s Mem. Opp'n 4.

8.      Also in April 2014, Bruley got into a basketball-like defensive stance to block Hernandez's movement down a hallway of the fire station.  Def.'s Mem. Supp. ¶ 4 n.4.  Bruley eventually walked by Hernandez without touching her.  *Id.*

---

[3] Defendant claims Bruley worded his response differently, saying "Maggie, you can't handle that big hose," and that he made this comment while putting his arm around her shoulder and while laughing.  Pl.'s Mem. Opp'n 4.

9.      In response to the April 29 incident in paragraph seven above, Hernandez asked Zosh to speak with Bruley but requested that Zosh handle the issue at the station level because she feared retaliation.  *Id.* ¶ 7.  Zosh addressed the issue with Bruley the same day.

10.     The next day, Zosh raised the issue again in a meeting with Hernandez, Bruley, and Captain Cunningham.  Zosh directed Bruley not to invade Hernandez's personal space or touch her, to stay two arms lengths away at all times, and not to say inappropriate things to her.  She also directed that physical contact should not be made without prior consent.  *Id.*  Hernandez considered Zosh's actions "appropriate."  *Id.* ¶ 8; *see also* Hernandez Deposition Transcript ("Hernandez Dep. Tr.") 155:3-5.  Zosh also recommended a fitness for duty examination for Bruley based on what she believed might be psychological issues.  Pl.'s Mem. Opp'n 10.  Dr. Donald Steward, the Director of the Occupational Health Center, concurred with Zosh's judgment and further recommended to the FRD leadership that Bruley be temporarily relieved from duty pending the results of that exam.  *Id.*  The Equal Employment Opportunity ("EEO") officer investigating Hernandez's complaint canceled any such examination, however, because of the pending complaint against Bruley.  *Id.*  Bruley eventually underwent this examination on a later date, though the results of that examination do not appear in the record.

11.     Following the April meetings with Bruley concerning Hernandez, Bruley's conduct took on a different aspect.  Although he no longer physically touched her or made sexual remarks, Bruley began to "ostracize" Hernandez around the station, though he continued to discuss business-related issues with her.  Hernandez Decl. ¶ 12.[4]  In reaction to Bruley, Hernandez did not read, but rather deleted without reading, at least some email correspondences from Bruley.

---

[4] As Hernandez detailed in her affidavit, "[Bruley] would walk away if I came into a room and he only talked to me about administrative matters like my time slips.  Otherwise, he would ignore me."  Hernandez Decl. ¶ 12.

*Id.*; *see also* Hernandez Dep. Tr. 156:4-20 (Hernandez acknowledges she "may have deleted" email from Bruley "[b]efore reading it.").

12.      In late June or early July 2014, Bruley made an unsubstantiated complaint to Deputy Chief Richard Roatch ("Roatch") about an inappropriate and possibly sexual relationship between Zosh and Hernandez.  Def.'s Mem. Supp. ¶18.

13.      On July 15, 2014, Zosh met with Bruley and directed him to make immediate changes at FS 42-C-shift, including the implementation of a daily physical training regimen.  Def.'s Mem. Supp. ¶ 13.  Bruley did this on July 17, 2014 and designated 9 a.m. for daily physical training ("PT").  On July 19, 2014, Bruley directed Hernandez to PT with the rest of the shift, but Hernandez claimed that she was not required to attend because she had already done PT earlier that morning.  Hernandez admits that she failed to comply with Bruley's direct order.  Hernandez Dep. Tr. 194:15–195:18.

14.      At some point after the July 15, 2014 meeting with Zosh, Bruley began documenting Hernandez's activities around the station, including to whom she was talking, to whom she gave hugs, and what she did on certain occasions.  *Id.* ¶ 15.  Hernandez has never seen the notes, although Bruley "freely showed [his notes] to Chief Zosh."  Hernandez Dep. Tr. 406:13-21, 407:11-12.  She only knew Bruley was engaged in this tracking of her activities from her discussions with Zosh and never personally observed any documentation activities.  Def.'s Mem. Supp. ¶ 15.  Zosh also told Hernandez that Bruley told Zosh that he wanted to know when Hernandez used the bathroom, although he never so informed Hernandez.  Hernandez Dep. Tr. 407:13–408:9.[5]

---

[5] Bruley claims that he tracked Hernandez because he perceived any physical contact at FRD—not just physical contact between him and Hernandez—to be a violation of Zosh's April 2014 order, Def.'s Mem. Supp. ¶ 16, and that he also documented improprieties by male FRD employees, *id.* ¶17.

15.     On July 17, 2014, Bruley complained to Zosh that there were issues pertaining to Hernandez that were not adequately being addressed and that these issues had begun to affect the day-to-day activities of the station.   Def.'s Mem. Supp. ¶ 19.

16.     On July 24, 2014, Hernandez and Bruley had a dispute over the meaning of a Standard Operating Procedure ("SOP") regarding the use of personal electronic devices.  Bruley claimed the SOP prohibited the use of cellphones during lineup, whereas Hernandez claimed Bruley misunderstood the SOP and that she merely corrected his misunderstanding.  *Id.* ¶ 21; Pl.'s Mem. Opp'n 5.

17.     Following the July 24, 2014 incident, Bruley filed a hostile work environment complaint, claiming that Hernandez inappropriately directed her superiors to complete tasks, was regularly late for lineups and drills, inappropriately used her cell phone during lineup, and was insubordinate on multiple specific occasions.  Def.'s Mem. Supp. ¶ 22.  Bruley wrote, "Hernandez is challenging everything I say and has become a liability. . . . She has no respect for her officers as she is willing to openly argue and contradict lawful orders in front of other employees. . . . [She] has been a disruptive force . . . I don't feel, based on the relationship between Zosh and FF Hernandez, that this can be resolved within the battalion."[6]  *Id.*; *see also id.*, Ex. 12.

18.     On July 28, 2014, in immediate response to Bruley's complaint, Hernandez was transferred from FS 42-C to Fire Station 2 ("FS 2") for a temporary assignment.  *Id.*, Ex. 2 ¶ 10-11.  She was then sent to Fire Station 1("FS 1") for seven work days and then in late September 2014, back to FS 2 for twenty work days, through October 17, 2014.  Def.'s Mem. Supp. ¶ 22.

---

[6] Hernandez claims that she "never refused an order from Captain Bruley although he spread rumors to other officers that she was insubordinate and made numerous disciplinary complaints against her."  Pl.'s Mem. Opp'n. 4.

19.     After her July 24, 2014 transfer, Hernandez never again worked under Bruley's supervision. *Id.* ¶ 56.  Nevertheless, Bruley, without Hernandez's contemporaneous knowledge, continued to monitor her from his separate location.  *See* Pl.'s Mem. Opp'n 5.  Hernandez later found out about this monitoring from a colleague.  In total, Bruley compiled three binders of notes and also apparently used electronic resources to make further records.  *Id.*

20.     Sometime in July 2014, Bruley had audio and visual recording equipment installed at the fire station.  *Id.*  The equipment was installed with the County's prior consent and was only placed in public areas around the station.  The record is unclear as to when Hernandez became aware of this equipment.

21.     On August 2, 2014, Deputy Chief Roatch met with Hernandez at FS 1 to discuss the July 24 incident, at which time Hernandez said she wanted to return to FS 42-C-shift if that could be accomplished without Bruley's also being there.  Def.'s Mem. Supp. ¶ 25.

22.     On August 18, 2014, Hernandez filed a sexual harassment and retaliation complaint with the Fairfax County Office of Human Rights and Equity Programs ("OHREP").  Def.'s Mem. Supp. ¶ 26.  Justin Wharton ("Wharton"), the Equity Programs Manager for OHREP, investigated Hernandez's complaint and, in a twenty-one-page memorandum report dated October 1, 2014, determined that her allegations were unsubstantiated.  *Id.* ¶ 28.  However, Hernandez claims that Wharton's investigation suffered from serious flaws including failures to interview Hernandez and to inspect Bruley's tracking notes.  Pl.'s Mem. Opp'n 10.

23.     On August 29, 2014, Assistant Chief John Caussin ("Assistant Chief Caussin") met with Bruley to discuss the various issues at FS 42.  Assistant Chief Caussin told Bruley not to discuss the Hernandez situation and that he should, instead, focus on his own personal duties as a shift leader.  Def.'s Mem. Supp. ¶ 31.

24.      In late October 2014, Bruley was transferred from FS 42-C-shift (Hernandez's previous

shift) to FS 23-B-shift, and at about the same time, Hernandez was returned to FS 42-C-shift.  *Id.*

¶¶ 32, 35.  Bruley formally contested this transfer in a grievance.[7]

25.      On November 15, 2014, Bruley was issued a broad directive to "cease all investigation of

matters related to your prior assignment [at FS 42-C-shift] that negatively impact or distract your

focus on your assignment and duties at [FS 2]."  *Id.* ¶ 37; *see also id.*, Ex. 23.

26.      On February 11, 2015, an incident occurred between Hernandez and Firefighter

Merneptah Funn ("Funn") during a FS 42-C-shift basketball game.  *See id.* ¶¶ 38-50.  The two

had a dispute on the basketball court which ended with a verbal confrontation between

Hernandez and Funn.[8]  Zosh stepped between the two firefighters, and Funn walked away.  *Id.*

Funn later asked Zosh to address Hernandez about the incident, and in response, Zosh asked

Lieutenant Mark Davidson ("Davidson") to investigate the incident.  *Id.* ¶ 39.  Hernandez spoke

with Davidson and took full responsibility for her actions and offered a full apology to Funn,

who interpreted her apology as being disingenuous.  *Id.* ¶¶ 40-41.  Funn therefore discussed the

incident with Captain Charles Cunningham ("Captain Cunningham"), who suggested that Funn

report the entire incident to Guy Morgan ("Morgan") in the FRD's Professional Standards

Office.  *Id.* ¶ 42.

27.      On February 12, 2015, Funn reported the incident to Morgan.  *Id.* ¶ 43.  Morgan

proceeded to investigate the incident and to interview Hernandez, Captain Steve Clark (the shift

captain at FS 2), Captain Francis Mensah, and Tech Jacob Quirke.  *Id.* ¶¶ 45-46.  He did not

speak with Carol Laymon, however, who Plaintiff claims was an eyewitness to the alleged

---

[7] The record inconsistently reflects that Bruley was transferred on October 28, 2013 and filed his grievance realted to that transfer on October 23, 2014.  *See* Def.'s Mem. Supp. ¶¶ 32, 34.

[8] Funn had previously been absent from work because of an injury, and the situation escalated when Hernandez asked Funn, "[W]hy don't you go back on light duty?"  Hernandez Dep. Tr. 291:5-13.

workplace violence.  Pl.'s Mem. Opp'n 14.  As part of Morgan's investigation into Hernandez, he discovered other information about past misconduct with which Hernandez had been involved including:

> A.  On March 27, 2013, Hernandez was involved in an altercation with Tech. Quirke, according to Captain Mensah and Tech. Quirke.  Def.'s Mem. Supp. ¶ 46.  At the time of this incident, Captain Mensah "advised [Hernandez and Quirke] of the possibility of progressive discipline should this continue to be a workplace issue." *Id.*
>
> B.  In 2014, Hernandez was arrested and charged with domestic violence and attended a six-month court-ordered anger management program.  *Id.* ¶ 47.
>
> C.  In September 2014, Hernandez was involved in an altercation with firefighters at FS 2, according to Captain Clark.  *Id.* ¶ 45.
>
> D.  In October 2014, Hernandez was involved in an altercation with firefighters at FS 2, according to Captain Clark.  *Id.*

In a memorandum report, Morgan sustained findings against Hernandez for workplace violence and unbecoming conduct.[9]  *Id.* ¶ 48.

28.     On June 8, 2015, based on that report, the County issued a written reprimand to Hernandez for workplace violence and unbecoming conduct.  *Id.* ¶ 49; *see id.*, Ex. 31.  Such a reprimand prevents an employee from being promoted for at least one year and remains in an employee's personnel file for at least three years.  Pl.'s Mem. Opp'n 15-16.  On July 19, 2015, as a result of her reprimand, Hernandez was also transferred out of FS 42-C-shift.  Def.'s Mem. Supp. ¶ 50.

29.     In February 2015, Morgan also investigated the numerous complaints that Bruley had made regarding Hernandez and Zosh and met with Bruley as part of that investigation at the direction of Jason Jenkins, the administrative aid to Fire Chief Richard Bowers ("Fire Chief Bowers").  *Id.* ¶ 51.  In mid-February 2015, Morgan notified Fire Chief Bowers that Bruley was, in fact, using Telestaff computer software to document the whereabouts of Zosh and

---

[9] Hernandez claims that Morgan failed to adequately consider Funn's credibility in light of what she claims is a history of reprimands for false reporting.  Pl. Mem. Opp'n. 13.

Hernandez.[10]  In response, Fire Chief Bowers told Bruley to cease this conduct and directed

Morgan to investigate Bruley's behavior to determine whether he violated the November 15,

2014 directive to terminate all investigations.  *Id.*  Morgan conducted a more thorough

investigation and concluded that Bruley had violated the November 15 directive by continuing to

use Telestaff to determine Hernandez's work assignments.  *Id.*

30.     Upon determining that Bruley had violated the November 15, 2014 directive, Battalion

Chief Daniel Shaw issued Bruley a written reprimand on March 3, 2015 for insubordination and

violating FRD's electronic communications and information technology systems SOP.  *Id.*  Fire

Chief Bowers also issued Bruley a direct order to cease tracking Zosh and Hernandez

immediately and informed Bruley that his failure to do so would result in his termination.  *Id.*  As

part of Morgan's investigation into Bruley, Morgan discovered other information about past

misconduct on the part of Bruley, including that Bruley had:

> A.     intimidated women at his wife's job in an attempt to coerce them to provide
>        proprietary information regarding his wife's salary;
> B.     was arrested for stalking his girlfriend and frightening her children after she broke
>        up with him;
> C.     had harassed and tracked the husband of a woman he was dating; and
> D.     was charged with a criminal violation and convicted of phone harassment.

Pl.'s Mem. Opp'n 8-9.

31.     There are no further instances in the record of inappropriate conduct by Bruley after

March 3, 2015.

32.     Bruley grieved the March 3, 2015 written reprimand and direct order, claiming they were

issued in retaliation for his complaints of discrimination.  Def.'s Mem. Supp. ¶ 53.  He then filed

a discrimination complaint with OHREP alleging sex-based discrimination and claiming that

---

[10] Telestaff is FRD's staff management software.  All FRD employees have access to Telestaff and are able to view
the full roster of employees and assignments.  Def.'s Mem. Supp. ¶ 29.  Telestaff's records are therefore not private
or confidential and in fact are open to inspection and copying by any Virginia citizen who follows the proper legal
procedures to obtain such information.  *Id.* ¶ 30.

Hernandez and Zosh were not disciplined for violating FRD rules, whereas he was. *Id.* ¶ 54.  He also alleged that the written reprimand was retaliatory.  *Id.*

33.    On July 30, 2015, the County received further notice that Bruley had filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for race and sex-based discrimination and retaliation in violation of Title VII.  *Id.* ¶ 55.

34.    On October 14, 2015, Hernandez filed her first and only Charge of Discrimination with the EEOC, alleging sex-based discrimination and retaliation.  *Id.* ¶ 58; *see also id.*, Ex. 51.

35.    Sometime around March 2016, approximately five months after Hernandez filed her Charge of Discrimination, Hernandez first discovered that Bruley had been using Telestaff computer software to ascertain Hernandez's work assignments, including specifically the station and apparatus to which she was assigned and overtime/callback assignments.  *Id.* ¶¶ 28, 57.  Bruley claims he did this tracking in order to document what he perceived to be improprieties concerning Hernandez's relationship with Zosh.  *Id.* ¶ 28.  Hernandez claims Bruley's tracking of her, even though unknown to her at the time, was a form of stalking and harassment.  Pl.'s Mem. Opp'n 5.

36.    Bruley retired from the FRD on September 11, 2016.  Def.'s Mem. Supp. ¶ 56.

37.    Fairfax County has a broad set of policies that prohibit discrimination and sexual harassment and mandate EEO training for all employees.  *Id.* ¶ 59.

> FRD also has policies that prohibit discrimination, harassment, and retaliation, and provides a procedure for reporting suspected harassment.  FRD provides EEO training to all recruits in recruit school.  FRD also has EEO counselors who are available to employees who have what they believe are EEO complaints.  The EEO counselors are there to answer questions, perform intake functions, and forward the complaints to FRD's EEO officer.  FRD's policy concerning discrimination, including its policy prohibiting sexual harassment, is posted in all of its fire stations.

*Id.*  Plaintiff does not contest the sufficiency of the policies that the County and FRD have in place, but maintains that they do not adequately enforce those policies.  Pl.'s Mem. Opp'n 8.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).

The party seeking summary judgment has the initial burden to show the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").  Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party.  *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

See analysis below.

## III.   ANALYSIS

Defendant claims that Bruley subjected her to sexual harassment which Defendant Fairfax County could have and should have done more to stop and that when she complained of this treatment, she was subsequently subjected to a hostile work environment because of her complaints.

Hernandez's complaints fall into three different categories:[11] First, she complains of Bruley's sexual advances toward her from October 2013 through April 2014, which she claims the County did not adequately stop.[12]  Second, she complains of Bruley's tracking activities and avoidance of her in the workplace, which she claims the County did not adequately stop.[13] Third, she complains of affirmative employment actions that the County took against her.[14]

### A.   Claims I and II: Sex-Based Hostile Work Environment[15]

Plaintiff first alleges that Fairfax County subjected her to unlawful harassment because of her sex.  *See* AC ¶¶ 16-17.

Title VII makes it illegal for an employer "to discriminate against any individual with respect to [her] . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  Work environment is considered to be a term or condition

---

[11] These categories are for descriptive purposes only and have not limited the Court's overall analysis, which it has based on all of the circumstances.  *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

[12] This category includes placing his chin on Hernandez's shoulder multiple times, asking Hernandez for a hug, telling Hernandez he wanted to see her in a bathing suit at his pool party on multiple occasions, referring to Hernandez's inability to "handle that big hose," and blocking Hernandez's movement down hallways on multiple occasions.

[13] This category includes Bruley's documentation of Hernandez's activities around the station, use of Telestaff software to monitor Hernandez's work assignments and locations, installation of audio and video recording equipment at the station, and attempts to avoid or ostracize Hernandez around the station.

[14] This category includes temporarily transferring Hernandez to other shifts for a period of three months, issuing Hernandez a written reprimand for the Funn incident, and permanently transferring her to a different station following the Funn incident.

[15] In her Amended Complaint, Plaintiff styles this claim "Claim I – Sexual Harassment."  *See* AC ¶¶ 16-17.  She also lists a second claim, which she styles "Claim II – Hostile Work Environment."  *See* AC ¶¶ 18-19.  In substance, however, her "Sexual Harassment" claim is a hostile work environment claim based on sexual discrimination.  In her memorandum in opposition, Plaintiff abandoned this distinction and treated the two claims as one in the same and stated during the hearing on December 9, 2016 that the two claims are actually one in the same, Hearing Transcript ("Hr'g Tr.") 44:4-15.

of employment so sexual harassment can be actionable based on a hostile working environment under Title VII. *EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001). To establish a hostile working environment based on sexual harassment, a plaintiff must present evidence to "prove that (1) the conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013) (citing *Spicer v. Va. Dep't of Corr.*, 66 F.2d 705, 709-10 (4th Cir. 1995)). There is no dispute that Hernandez did not welcome the conduct of which she complains. Therefore, the Court must consider only the remaining three factors.

### 1.       The conduct was based on plaintiff's sex.

"The critical issue [in the 'because of sex' inquiry] is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80) (internal quotation marks omitted). On the one hand, "workplace harassment, even harassment between men and women," is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80. On the other hand, when "the challenged conduct . . . involves explicit or implicit proposals of sexual activity[] it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id.* Here, the evidence is clearly sufficient for a reasonable fact finder to conclude that Bruley's challenged comments and conduct were based on Hernandez's sex.

## 2. The conduct was not sufficiently severe or pervasive.

A plaintiff must demonstrate that the harassment was "sufficiently severe or perverse to alter the conditions of [the victim's] employment and create an abusive working environment." *Ocheltree*, 335 F.3d at 333. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris*, 510 U.S. at 23. Among the factors a court should consider are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The "severe or pervasive" standard is both objective and subjective. *Ocheltree*, 335 F.3d at 333 (citing *Harris*, 510 U.S. at 21-22). The objective portion of that standard is designed to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). For example, the "[m]ere utterance of an epithet which engenders offensive feelings in a female employee [does] not affect the conditions of employment to a sufficiently significant degree to violate Title VII." *Pagana-Fay v. Wash. Suburban Sanitary Comm'n*, 797 F. Supp. 462, 468 (D. Md. 1993), *aff'd* 64 F.3d 658 (4th Cir. 1995) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

The conduct that Hernandez complains of occurred frequently for a period of approximately one year spanning October 2013 to July 2014, with individual incidents of harassment occurring thereafter. These incidents no doubt would allow a fact finder to conclude, as Hernandez claims, that she felt humiliated going to work every day. And as a relatively young female employee wanting to advance in the department, Hernandez no doubt felt added pressure not to complain about these unwelcome acts from her significantly older direct

15

supervisor for the nearly six months leading up to her first complaint in April 2014.  *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 696 (4th Cir. 2007) (finding that "positions and ages of the harasser and victim" are relevant factors in determining severity of harassment).  Moreover, the record establishes that Hernandez was fearful of Bruley.  For these reasons, a reasonable jury could conclude that the conduct was subjectively "severe or pervasive" to Hernandez.

However, based on Fourth Circuit precedent, as a matter of law, Bruley's inappropriate, boorish, insensitive, and demeaning incidents between October, 2013 and April 29, 2014, either individually or collectively, are not sufficiently "severe" or "pervasive" under an objective standard for the purposes of imposing liability under a sexual harassment claim.  Nor do Bruley's tracking activities after April, 2014, some of which Hernandez' did not learn about until after she filed her EEOC complaint, add the necessary factual basis for such a claim.  In that regard, Courts of Appeal throughout the country, including the Fourth Circuit, have rejected as sufficiently severe or pervasive comparable or more egregious conduct.[16]  As one Court of Appeals summarized the law, "[a]ll of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment."  *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir.1999).  For these reasons, no reasonable jury could find that Plaintiff has presented facts that satisfy the objective standard for "severe or

---

[16] *See, e.g., Lacy v. Amtrak*, 2000 WL 223335, at *3-4 (4th Cir. Feb. 28, 2000); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999) (en banc); *Shepherd v. Comptroller of Public Accounts of Tex.*, 168 F.3d 871, 872-75 (5th Cir. 1999); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998); *Adusumilli v. City of Chicago,* 164 F.3d 353, 357 (7th Cir. 1998); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997); *Hopkins v. Baltimore Gas and Elec. Co.*, 77 F.3d 745 (4th Cir. 1996); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993); *Hosey v. McDonald's Corp.*, No. AW-95-196, 1996 WL 414057 (D. Md. May 17, 1996), *aff'd*, 113 F.3d 1232 (4th Cir. 1997).  At the December 9, 2016 hearing, in response to the Court's question, Plaintiff's counsel was unable to identify any case where facts comparable in impact on an employee to those in this case were deemed sufficiently severe or pervasive, and the Court has found none.  *See* Hr'g Tr. 46:1-17.

pervasive" conduct.  The Plaintiff has, therefore, failed to demonstrate the third element of a hostile work environment claim.

### 3.    The conduct is not imputable to Fairfax County.

Plaintiff has also failed to present evident sufficient for a reasonable fact finder to conclude that Bruley's harassing conduct is imputable to his employer, Fairfax County.  Where an employee complains of sexual harassment by a coworker, "the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it."  *Ocheltree*, 335 F.3d at 333-34 (citing *Spicer v. Va. Dep't of Corr.*, 66 F.2d 705, 710 (4th Cir. 1995)).  "Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment."  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008).  Instituting and maintaining an anti-harassment policy, combined with maintaining a complaint procedure, help the employer to establish that it has exercised reasonable care but will not suffice when the employer administers the policy in bad faith or renders in ineffectual by acting unreasonably.  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 187 (4th Cir. 2014).[17]

The County's anti-harassment policies clearly prohibit the type of conduct Hernandez complains of here and make available various grievance mechanisms.  The issue is whether the County's "responses to the complaints made under its policies were not reasonably calculated to end the harassment and, therefore, that liability for the harassment may be imputed to it."  *EEOC v. Xeres Corp.*, 639 F.3d 658, 669 (4th Cir. 2011).  In deciding that issue, courts have considered "the promptness of the employer's investigation when the complaints are made, whether

---

[17] The more demanding vicarious liability standard that applies in cases of alleged harassment by a supervisor of an inferior does not apply to a case like this where the supervisor was not "empowered by the employer to take tangible employment actions against the victim."  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (quoting *Vance v. Ball State Uni.*, 133 S.Ct. 2434, 2439 (2013)) (internal quotation marks omitted).

offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective." *Id.* "[R]esponses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998)) (internal quotation marks omitted).  A significant consideration is whether the employer "progressively stiffens its discipline," but "an employer is not required to terminate a [particular] perpetrator except where termination is the only response that would be reasonably calculated to end the harassment."[18] *Id.* (quoting *Adler*, 144 F.3d at 676) (internal quotation marks omitted).

Here, although the evidence shows that Bruley had harassed Hernandez as early as October, 2013, Hernandez did not complain about the harassment until April 29, 2014.  When she first complained about it to Zosh, she asked Zosh not to initiate any action beyond the station level.  Zosh spoke with Bruley about the incident the very same day that Hernandez complained about it and then met the following day with her superiors to report what had occurred.  Zosh and Dr. Steward recommended that Bruley undergo a fitness for duty examination and be temporarily relieved from duty in the meantime.  Bruley was never temporarily relieved from duty and only underwent a fitness for duty examination significantly later, but Hernandez concedes that Zosh's response was "appropriate" at that time.  Hernandez Dep. Tr. 155:3-5.  Fairfax County was faced with a situation in which it had to consider a variety of factors, and the County made a reasonable decision at the time, as even Plaintiff concedes.

---

[18] The *Adler* court went on to say, "Unfortunately, some harassers may simply never change.  Just as unfortunate, a victim may have to suffer repeated harassment while an employer progressively disciplines the perpetrator to determine whether he or she is just such a 'hard head' case."  144 F.3d at 676.

After the County's first response, Bruley never again made any sexual advances toward Hernandez, an indication of the effectiveness of that response, but Bruley did begin his tracking activities and other harassing conduct such as ignoring Hernandez. The County was not made aware of this conduct until August 18, 2014, however, when Hernandez filed a complaint with OHREP. The very next day, Assistant Chief Caussin met with Bruley and ordered him to stop focusing on Hernandez. On October 1, 2014, the County concluded its formal investigation into Hernandez's OHREP complaint and found her allegations unsubstantiated. A fact finder might reasonably find that investigation deficient, as Plaintiff claims, in that Hernandez was not interviewed. Nevertheless, after Bruley continued his tracking activities, this time utilizing the Telestaff system, he was transferred to a different battalion on October 28, 2014 and issued a broad directive on November 15, 2014. Once it was determined that he failed to follow the November 15 directive, he was issued a formal written reprimand and threatened with termination on March 3, 2015. That discipline appears to have been effective, as the record contains no additional instances of harassing behavior by Bruley after March 3, 2015.

Overall, while the County's response was not perfect, it acted reasonably and effectively to investigate and remedy Bruley's offensive actions toward Hernandez. For the above reasons, Plaintiff has failed to present evidence sufficient to impute Bruley's conduct to his employer, Fairfax County. Because the evidence in insufficient as a matter of law for a reasonable fact finder to impute Bruley's actions to Fairfax County or to find his conduct sufficiently severe or pervasive, Defendant is entitled to judgment as a matter of law on Counts I and II.

B.      **Claim III: Retaliation**

Plaintiff also claims that Fairfax County subjected her to a hostile work environment in

violation of Title VII because of her sex and also because of her protected activity  *See* AC

¶¶ 18-19.

Under Title VII, it is illegal for an employer "to discriminate against any of his

employees . . . because he has opposed any practice made an unlawful employment practice by

this subchapter, or because he has made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-

3(a).  To establish a prima facie case of retaliation, an employee must demonstrate "(1)

engagement in a protected activity; (2) adverse employment action; and (3) a causal link between

the protected activity and the employment action."  *Coleman v. Md. Ct. of Appeals*, 626 F.3d

187, 190 (4th Cir. 2010).  If the plaintiff succeeds, then "the burden shifts to the defendant to

demonstrate a legitimate non-retaliatory reason for its action."  *Bush v. Hagel*, No. 1:12-cv-

01483 (AJT/IDD), 2014 WL 345650, at *5 (E.D. Va. Jan. 30, 2014) (Trenga, J.).

1.      **Plaintiff engaged in protected activity.**

As the text of Title VII makes clear, opposition to any practice made an unlawful

employment practice by Title VII or making a charge, testifying, assisting, or participating in any

manner in an investigation, proceeding, or hearing under Title VII are all protected activities.

Generally speaking, "the employer [may not] take adverse employment action against an

employee for opposing discriminatory practices in the workplace."  *Laughlin v. Metro. Wash.*

*Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).  At a minimum, her official reports of

discrimination to her supervisor, Zosh, in April 2014 and her filing of a complaint with the

Fairfax County OHREP on August 18, 2014 constitute such protected activity. Accordingly, Plaintiff has satisfied the first element to demonstrate retaliation.

### 2. Plaintiff suffered an adverse employment action.

"[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Rather, the plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F. 3d 1211, 1219 (D.C. Cir. 2006)).

Here, as adverse retaliatory employment actions, Hernandez cites her temporary transfers to other shifts from July to October 2014, her written reprimand that she received for workplace violence and unbecoming conduct in February 2015, and her permanent transfer to a different fire station in February 2015. *See* Pl.'s Mem. Opp'n 22-26. The transfers, however, are not adverse employment actions because there is no evidence that they had any effect on her future employment, position, opportunities, or wages. Moreover, these transfers separated her from Bruley, in the case of the temporary transfers, and from coworkers such as Funn, with whom she had been involved in a dispute, in the case of the permanent transfer. A reasonable employee would not find these consequences "materially adverse" because they did not affect the conditions or terms of Hernandez's employment and because they separated her from the hostile environment of which she complained.

Plaintiff also claims that she suffered an adverse employment action in retaliation for protected activity when Fire Chief Bowers failed to warn her, but not Zosh, about the possibility

that Bruley might respond physically after the County issued Bruley's directive on November 15, 2014.  In that regard, Hernandez points to Bowers' statement to Zosh that he did not give such a warning directly to Hernandez because Hernandez had "lawyered up."  *See* Pl.'s Mem. Opp'n 26.  Plaintiff further emphasizes that this occurred approximately one week after Plaintiff's counsel sent the County a letter and that approximately one month after Fire Chief Bowers made his "lawyered up" statement, the Professional Standards Investigator found that Bruley had expended significant time and effort tracking Zosh and Hernandez.  Putting these facts together, Plaintiff appears to argue that Fire Chief Bowers or the County retaliated against her, and she suffered an adverse employment action as a result, by not acting to protect her from a significant possibility of physical violence from Bruley, or at least condoning or tolerating Bruley's harassment, because she had "lawyered up" as part of her protected activity.  The evidence is insufficient, however, for any reasonable fact finder to reach those conclusions, particularly since Bowers' warning to Zosh was likely intended to be passed on to Hernandez, and Zosh did, in fact, pass on that warning.  Hernandez Decl. ¶ 18.

However, the written reprimand issued on June 8, 2015 affected Hernandez' future prospects and potentially increased any future discipline, and a reasonable worker might well be dissuaded from making a charge of discrimination if subjected to those consequences. Defendant argues that no collateral consequence resulted from the written reprimand, but at a minimum, the written reprimand prevented Hernandez from being eligible for a promotion for at least one year, and will remain on her permanent employment record for at least three years, which could conceivably heighten any further discipline to which she might be subjected in the future.  While it is true that Hernandez has already served as a firefighter for approximately eight years without promotion, she nevertheless became ineligible for the promotion as a result of her

discipline; to hold otherwise would require the Court to speculate as to an employee's chances of promotion.[19]  Under the Supreme Court's lowered adverse action standard in *Burlington*, the evidence is sufficient for a reasonable jury to find that such a written reprimand might well dissuade a reasonable firefighter from complaining, and the written reprimand therefore satisfies the second element to establish retaliation.

### 3.    There is no causal link between the protected activity and the adverse employment action.

"Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m).  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. S.W. Med. Cent. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). "[E]vidence that the alleged adverse action occurred shortly after the employer became aware of the protected activity is sufficient to satisfy the less onerous burden of making a prima facie case of causation." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

For the reasons described above, Hernandez's written reprimand was the only adverse employment action she suffered.  The County issued that reprimand on June 8, 2015, which was nearly ten months after Hernandez complained to the Fairfax County OHREP and fourteen months after she complained to Zosh.[20]  No reasonable inference of but-for causation can therefore be drawn based on temporal proximity.  *See King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (finding that a gap of "two months and two weeks . . . gives rise to a sufficient

---

[19] Defendant also argues that Hernandez was ineligible for a promotion to the position of EMS technician which she had coveted.  *See* Def.'s Reply 19.  Even assuming Defendant is correct, Hernandez was affected by the reprimand with respect to any other position for which she might have been eligible or later become eligible, even if she did not specifically desire the position at that time.

[20] During the hearing on December 9, 2016, Plaintiff also claimed that she suffered retaliation for "pursuing her claim with the EEOC," *see* Hr'g Tr. 36:3–37:6, but Hernandez did not file her claim with the EEOC until October 14, 2015, four months *after* the allegedly retaliatory action took place.

inference of causation" but was "sufficiently long so as to weaken significantly the inference of causation between the two events"); *see also Pascual v. Lowe's Home Ctrs., Inc.*, 193 F.App'x 229, 233 (4th Cir. 2006) (per curiam) (finding that a gap of three to four months between the complaint and adverse employment action was "too long to establish a causal connection by temporal proximity alone."). Hernandez presents no affirmative evidence that but for her protected activity, she would not have been disciplined over the basketball incident.

Second, the County has presented legitimate, non-retaliatory reasons for disciplining Hernandez. *See Lacy v. Amtrak*, 2000 WL 223335, at *3 (4th Cir. Feb. 28, 2000) ("Title VII . . . does not give a woman immunity from being reprimanded in the presence of her co-workers if her supervisor believes she has violated work rules or has been negligent in performing her job." (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1545-46) (10th Cir. 1995) (internal quotation marks omitted)). The most immediate cause of the reprimand was her basketball court dispute with Funn, but that discipline was imposed with knowledge of Hernandez's three previous work-related altercations with firefighters other than Bruley as well as a charge of domestic violence which resulted in Hernandez attending six months of court-ordered anger management classes.[21] In response to an incident that occurred on March 27, 2013, the County even warned Hernandez that she might be subject to increasingly severe discipline if she misbehaved in the future. In any event, it is not the County's burden to prove that its decision to issue the reprimand was the best decision or even a reasonable one. Rather, Plaintiff must adduce evidence that allows a reasonable fact finder to conclude that there was the necessary causal connection between her protected activity and her written reprimand. Here, because there

---

[21] In support of her claim of retaliation because of protected activity, Plaintiff claims Defendant did not actually rely on the assertion that Hernandez ridiculed Funn for his disability until this litigation. Pl.'s Mem. Opp'n 27. The written reprimand explicitly stated that Hernandez "challenged the firefighter verbally, violating his body space with aggressive head and arm gestures." Def.'s Mem. Supp., Ex. 31. Moreover, Hernandez explicitly stated in her deposition that she "told him to go back on light duty." Hernandez Dep. Tr. 291:5-13. In any event, the County's justification for the written reprimand did not necessarily depend entirely on the facts of the basketball incident.

is no temporal or other demonstrable connection between her reprimand and her protected activity ten months earlier, Plaintiff has failed to make a prima facie case for retaliation. Plaintiff's claim on Count III must therefore be dismissed.

## IV.   CONCLUSION

For all of the aforementioned reasons, the Court finds and concludes that there are no genuine issues of material fact, and Defendant is entitled to judgment as a matter of law as to all claims. The Defendant's motion for summary judgment on Plaintiff's Amended Complaint is therefore GRANTED, and this action is DISMISSED.[22]

The Court will issue an appropriate order.

_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
January 30, 2017

---

[22] The Court also grants Defendant's Motion to Strike [Doc. No. 59] for the reasons stated above and denies Plaintiff's Motion to Exclude Character and Propensity Evidence [Doc. No. 36] and Defendant's Motion in Limine [Doc. No. 40] as moot.